and Al-Jamal Islamic Bank, Mr. Deakins for the imbalance, Mr. Bukuzi for the ebullience. Good morning. Good morning, may it please the court. Republic of Sudan entered into a conspiracy with the defendant BNP Paribas and the terrorist organization Al-Qaeda to engage in a conspiracy to defeat United States economic sanctions. BNP entered into that conspiracy knowing that funds cleared for that unlawful enterprise, which began in 1997, would be used to support terrorists. For its part in the conspiracy, BNP Paribas created a complex system to elicit U.S. dollar payments while Al-Qaeda used violence. The 1998 terrorist attacks were done in furtherance of that conspiracy. We know this not because of speculation or inference. We know this because Al-Qaeda told us themselves that that was criminal trials of the Al-Qaeda for the very attack that killed and injured the plaintiffs here in this case, that they used bank accounts within Al-Jamal, a bank operating in the United in Sudan, who funded that attack. Now these allegations are more than enough to state a claim for conspiracy in aiding and abetting. Conspiracy in aiding and abetting what? Well, it's anything if we look at it from conspiracy... Everything you said there had to do with defeating the embargo. Maybe they did conspire to defeat the embargo, but that doesn't create a private claim cause of action, does it? It does under a conspiracy theory, uh, in which... Well, conspiracy has to have a substance that, a goal that is unlawful. And that, that's fine. But even though you may have an unlawful attempt to defeat the embargo, that does not give a private claim for relief than just defeating the embargo does. Under the conspiracy, as alleged in this complaint, the agreement that is the focus of the conspiracy is the agreement to defeat United States economic sanctions. That is the agreement entered into by the MP Paribas. I'm not believing everything taking your allegations is true. You still haven't gotten to a private claim for relief at this point, have you? But what is the goal of the conspiracy that was accomplished that caused damage to your client? So the goal of the conspiracy was to defeat those United States economic sanctions. The overt act, and the overt act that gave furtherance of that conspiracy, that gave rise to the claim, is the bombing of the embassy. And it's, we know, once again, that that was one of the goals of Al-Qaeda, to defeat the United States economic sanctions, as played in the complaint. That's two different goals. Bombing an embassy and, and breaking, uh, sanctions is not the same thing, is it, Councilman? In a conspiracy under Halberstam. And if we look at Halberstam specifically... I've looked at Halberstam for years. I'm sure, Your Honor. What they found was that a civil conspirator can be liable, even if he neither planned nor knew of a particular act. But in that case... But she knew he was engaged in illegal activities, the activities that gave rise to the murder, murder that gave rise to the claim for relief. But here, I mean, that was part of the goal of death. But here, you're telling us about a conspiracy to defeat economic sanctions, but I'm not finding a private claim for relief in it. And from the conspiracy aspect, what gives rise to it, if there is an agreement, and the agreement is here to defeat the sanctions, the injury is caused by an unlawful overt act in furtherance of that conspiracy. And that's where the bombing comes into play, because Al-Qaeda, and once again, they told us that one of their goals in furtherance of the conspiracy was to defeat the sanctions. So they agreed and said, we're bombing the embassy because there is this United States economic embargo in Sudan. And once again, that's directly from the mouths of Al-Qaeda, as we're doing this because of this embargo, we're seeking to defeat the sanctions. And that's the same goal that the Republic of Sudan and BNP have, but it's the overt act. Linda Hamilton in Halberstam did not have the goal of the murder of Mr. Halberstam. Linda Hamilton's goal was different, and it was the overt act of the murder which gave rise to the allegation. The murder was a murder because it was a felony murder, and the felony involved was the goal of the conspiracy. That really was a pretty direct part of the conspiracy, but a conspiracy to conduct the economic transactions here does not have the kind of foreseeability that you had in Halberstam. Linda Hamilton and Mr. Welch in that case agreed to undertake the legal enterprise of acquiring stolen property. Now, the murder, whether it was foreseeable or not, we put that aside. As long as it was done in furtherance of the conspiracy, that's what gives rise to the cause of action. And here- How did bombing an embassy help end sanctions? Well, we don't- How would anyone think that bombing an embassy would make the United States less likely to put sanctions on? Well, the motion is misstated, Your Honor. It's not the goal to, to- whether or not we believe Al-Qaeda in their statement of this is why we did it. Assuming we believe all of this, how does bombing an embassy further a conspiracy, as far as we know, the conspiracy the bank entered to defeat economic sanctions? Well, I don't think we need to get the state of mind of Al-Qaeda on their basis, but if we- I think you need to get somewhere that makes this bank a conspirator in a conspiracy to commit the embassy bombing in order to have a private claim for relief. And I'm exploring how you get there, and I'm not getting there. Al-Qaeda's told us, right, that here are the reasons why we're bombing an attack. And this sets the case away from the Bernhardt case, which was decided, in which the court looked at the specific reasons. In that case, you know, a bombing of a small secret CIA camp, you know, it was completely implausible that it would be based on them doing that act to defeat the United States. Here, it's different. This is a widespread attack in which they focus, and we have pled from 1997 that bin Laden was talking about the U.S. embargo, about what he was going to do with respect to that, and undertook these efforts to bomb the attack, to defeat those sanctions. Now, we don't have to say, okay, that doesn't seem right in my mind. That was what Al-Qaeda specifically did, to chase Americans out, to kill them, to make them withdraw their sanctions. Mr. Diggins, how can you distinguish the facts here from Owens? I mean... Yeah, and it's a good question, Judge Rauh. This case is not Owens, and it's not Owens in either allegations pled or the cause of action raised. And so, if the Owens... We know it's not Owens, but how do you get around Owens in prison? Yeah, so Owens, in looking at the allegations there, Owens didn't contain any allegations regarding Al-Shamal or the use of Al-Qaeda accounts in Al-Shamal prior to the attacks. It contained no allegations of Al-Qaeda's use and reliance on Sudanese banks prior to the 1990 embassy bombings. It contained no publicly available reports behind Sudan to Al-Qaeda. And why do those things make a difference? Well, those things make a difference, one, because they didn't allege, and the next step of it is they didn't allege any secondary liability. They only did it through the ATA plan, but the court determined, based on the older version, that secondary liability wasn't available at that stage. And so, there were no secondary liability for conspiracy in aiding and abetting. These elements that I just stated are relevant to general awareness under aiding and abetting. It's relevant to, once again, the furtherance of the conspiracy, but it's also relevant to knowledge and the close proximity or the close ties between BNP Al-Shamal, as well as the Republic of Sudan. So, Al-Shamal here was not a Sudanese entity. It was a separate intermediary, and we must look at those intermediaries separately. See, I'm running out of time. If I can save any time, I have lots of time. Thank you. Good morning, and may it please the court. Harman Bakritsi from Clary Gottlieb for the AFL-E BNP Paribas. The district court was correct in dismissing the complaint. The correctness of its ruling was confirmed by this court's decision in Owens, as well as this court's decision in Bernhardt, the Second Circuit's decision in Rothstein, which Owens followed, as well as the Seventh Circuit in Kemper and many others. In this case, there is no pleading of any meeting of the minds between BNP Paribas and Al-Qaeda. There's actually nothing pled about any connection between BNP Paribas and Al-Qaeda. The complaint does not plead that BNP Paribas was banking Al-Shamal. It doesn't plead that it was aware of any connection between Al-Shamal and Al-Qaeda. It doesn't even plead in a non-conclusory way that BNP Paribas was aware that Al-Qaeda was working with Sudan. Just as in Rothstein, there's no pleading that BNP Paribas was a participant in any attack. There's no pleading that any money sent by BNP to Sudan, to the extent that happened, had any connection to the attack. And there's no pleading that any money directly went to BNP to Al-Qaeda. With no well-pleaded allegations, the court was correct to dismiss the ATA claim, just as in Owens, for failure of approximate causation. As to conspiracy, there is no common goal. Judge Santella, your questions are absolutely right. It's clear that BNP, like the banks in Bernhardt and in other cases, was acting to evade sanctions for a profit motive. They say, oh, we're all agreed on defeating sanctions. But defeating sanctions is a characterization on their part for Al-Qaeda committing murder to get the United States out of Syria. So the conspiracy claim in paragraph three is explicitly said not to be the aim of BNP Paribas. It says BNP did not share the intent of Al-Qaeda to commit any murder, to harm anyone. So the conspiracy claim fails for that simple reason, as well as in Bernhardt, where the court said, where is the act in furtherance of the conspiracy? So can I ask you about your characterization of the Jesner case, the Supreme Court's case in a barred jurisdiction here. But as I read that case, it's really about a cause of action. And so I'm wondering why you read it as a jurisdictional bar. Is this the ATS claim? Yes. The Supreme Court has often said Jesner is jurisdictional, but also you're correct, Judge Rao, it's bringing in this cause of action for an international law court. And so in that way, it's a threshold. It's a threshold issue. But is it a jurisdictional one? I think it is a jurisdictional issue. But either way, it's an issue that came up after the decision by the district court judge, which is why we raised it on appeal as a complete part of this claim, because Jesner says you don't have a cause of action. There is no jurisdiction in U.S. courts for a claim like these claims against a foreign bank or a corporation. That case was decided in the context of a foreign bank that, like the NPP, violated U.S. sanctions. But because it was not a U.S. citizen, the case was dismissed. Not a U.S. person. I'm sorry? You said a U.S. citizen, because it was not a U.S. person. U.S. person. Thank you, Your Honor. So the ATS claim falls as well. And then as to aiding and abetting, you don't have any of the elements that would bring about a claim under the standard of Halberstam. And we did raise that as a threshold issue, whether there's a preemption issue here, given the language in Jesner, that it would be odd to create a common law cause of action in that context. And here we've got Congress all over the field of terrorist leasing, the criminal law, the attendant civil law violations. And here JASTA, which is aiding and abetting, is very the actor. So let's unpack that argument a little bit. Are you arguing that the state common law claims are preempted under the reasoning of Jesner? Yes, Your Honor. Yes, Your Honor. That's not so clear in your briefing. You talk about common law generally, and Jesner is about creating federal common law. But how does that relate to existing state common law claims? And whether that reasoning preempts the existing state common law? I think about it because of the role of Halberstam. The federal, the JASTA statute says you look to Halberstam as a form of federal common law that'll be applicable under the statutory regime. It then says that if the attack occurred before 2001, it's not cognizable under Jesner. It also says you need the FTO involved. And Al-Qaeda was not an FTO until after this attack several years later. And so if you look at that, it then does seem odd to say we're going to go to federal common law through a Halberstam claim and have this claim proceed. It's not federal common law, right? The plaintiffs are bringing a state common law claim. I mean, is there a distinction? I don't think there's a distinction because you're still in the realm of common law where Congress has really occupied the field. So I'm not arguing field preemption. We're discussing obstacle preemption. And so we think that's an important consideration given that language in Jesner and the way Congress has really very carefully calibrated these different causes of action and the concerns about international comity and the fact that the policing of terrorism is a uniquely federal interest. And so that is why we think there is that threshold issue. Of course, this court doesn't need to reach it because the claims here fail applying the Halberstam framework. There is no, first of all, general awareness as with Linda Hamilton, the Halberstam case. There she knew that her husband was engaged in property crimes. And so knowing that and being tied together with those property crimes, she was charged with the reasonably foreseeable effect of the felony murder that occurred against Mr. Halberstam. Here, of course, there was no general awareness on the part of BMPP because there's no obligation that we were banking any terrorists. And then otherwise, we're just back to this indirect connection through Al-Shamal or through Sudan where there's no allegation we knew that any of those entities were dealing with Al-Qaeda. And there's a further layer here on the point that they haven't adequately planned that we were banking Al-Shamal. They say we admitted that. And they say that in paragraph 90 of the complaint. But we didn't admit that. If you look at the statement of claims or statement of facts, there's no admission that the bank was banking Al-Shamal. And even if we relied on what they say, the admission concerns the period 2002 to 2009. So four years and later after the 1998 data tax issue in this case. So you don't satisfy the general awareness prong of Halberstam. And then going to the six factors, I think this court's decision in Bernhardt and the decision of the Second Circuit in Siegel are a fortiori here. There's no allegation that we had any encouragement of these attacks. In terms of whether or anything we do is a significant factor, Bernhardt and Siegel are a fortiori. There, the allegations concern billions of dollars of being transferred by HSBC, in the Siegel case, hundreds of millions of dollars. And the court said, but there's no link to that money to those entities and to the terrorist actors. Here, we don't even have amounts specified. We just have an allegation that there are accounts open. And it also says the allegation references accounts being open in BNPP Geneva, which is a separate sub and is not even the defendant here. So you have a further layer, lack of any connection between anything BNPP did and anything that's alleged to have happened in these attacks. There's no presence of BNP, the third factor, whether you think of that as transactional or, of course, no physical presence. There's no relationship with Al-Qaeda. As we discussed, there's no knowledge of Al-Qaeda's involvement. And we're also talking about, in both Siegel and Bernhardt, we were talking about years of activity by the banks, and that was insufficient duration. Here, plaintiffs are talking about a window of a few months between November 1997, when they claim we started, or when we started evading sanctions, and when the attack started in August 1998. There's no allegation that in that window, when accounts were alleged to just being opened, that there was any material transaction related in any way to Al-Qaeda. So just as in O-Ns, which is complaint, by and large copies, other than just having this characterization of sanctions and having general references to Al-Shamal, this case should be dismissed, or the dismissal should be affirmed. This is the dismissal in the O-Ns case. Unless you're honest, I have questions. Judge Rogers? Thank you. Mr. Dickens, we'll give you two minutes. My friend stated that one of the reasons you can find there's no conspiracy here is because there was no intent. But intent is not required under a conspiracy, nor is the fact that the unlawful act giving rise, or the unlawful act that's agreed upon, is an unlawful act that gives rise to a private cause of act. It just says it's an unlawful act, which being agreed upon. Here, that unlawful act is by the defeat of the sanctions that was set forth in November 1997. Now, this case is even worse than some of those cases my friend cites, Bernhard and Siegel, because here, BNP rushed to the aid of Sudan, which was an impoverished country, relying on funds and U.S. dollars for financial stability. Here, BNP came in for the sole reason to defeat the sanctions to make up. So, when we're talking of questions about- Aren't you in a little trouble if that's the sole reason? Defeating the sanctions? I'm sorry, what was that? Aren't you in a little trouble if that's the sole reason to defeat sanctions? I'm still not sure how you get that to be a private cause of action. Contrary to what you seem to be saying, you have to have a private cause of action to be here. And what our argument here is, your honor, is that the unlawful act that gives rise to the conspiracy, you know, we have to look at it in two parts. What's the unlawful act? The unlawful act here is defeating sanctions, but that's not what gives rise to the private cause of action. It's what is done in furtherance of that conspiracy. So, in broad measure- Okay, and you're insisting that the embassy bombing was something that was in the contemplation of a conspiracy to defeat the sanctions? And the reason, and I'll cite the court to paragraph eight of our complaint, this is a direct quote from Al-Qaeda. One of the stated reasons was to cease the campaign for the annihilation and humiliation that's being waged by the United States based on the blockades or economic sanctions. That was a stated reason, and it's not our role here to say that doesn't make sense. We must accept that as true and take those inferences in favor of plaintiff. And when we do so and have those allegations and it's been shown in Bernhardt that indeed that act was in furtherance of the conspiracy, it would have met those elements. That is what was missing in Bernhardt and the other cases in which found there is no conspiracy. Here, this is a unique case. We admit to that. It's a unique case by which we have a terrorist organization telling us we bombed- Don't you, in fact, have an effectual allegation of the meeting of the minds involving both the bank and Al-Qaeda? Well, what the case law tells us is we don't need a meeting of the minds between all of the different conspirators. All we need is a shared goal that was agreed upon generally. Al-Qaeda didn't need to know about BNP, and BNP didn't need to know about Al-Qaeda. With respect to, and the court asked some questions about Jesner and the ATS claims, our position is it's not as simple as saying, OK, BNP is a foreign corporation. There must be some analysis, and there must be some way to figure that out. The Supreme Court didn't give any how to analyze that, and diversity jurisdiction is not the way. Here, these sanctions specifically define who a U.S. person is. That's what gives rise to our complaint. U.S. person, underneath the sanctions, which the complaint- U.S. person, the closest you come in the statutory language is a person in the United States is a corporation which is a corporate citizen in creation of a foreign country, a person in the United States. Doesn't the Supreme Court say they're not? Well, under the sanctions remedy, and the question, once again, is we must look at the actual allegations of the complaint, because what the court didn't say is, well, if there's a bank over there in headquarters somewhere else, they can never be a foreign corporation. First subject matter jurisdiction under the ATS. Those are words that have common meaning. A foreign corporation is a foreign corporation. It's a corporation that's a foreign business, and it doesn't- you don't need a statutory definition. Those words are commonly used, just as a United States person is commonly used, and has never been applied to a foreign corporation. Well, it depends in the question of what we're looking at. For personal jurisdiction, we agree, but that's laid out in- Yeah, but in international law, the term a United States person or a Republic of France person or whatever is a common usage, and it is used to refer to citizens and nationals of permanent residence, persons who owe an allegiance to that nation, and I don't see how you get this foreign bank to be a United States person. Well, in Jesner, obviously, they were concerned with foreign policy issues, and what- In this case, I'm concerned with how you get this to be a foreign- get this to be a U.S. What Jesner said is the political branch is not the judiciary to weigh in. Here, the political branch did weigh in. We have the executive branch stating, for purposes of violating the Sudanese sanctions, a U.S. person is defined as someone in the United States, as well as foreign branches operating in the United States. So- No, what would you get there as well as foreign branches operating in the United States? That's not in the statute, is it? It's within the executive order that gives rise to the Sudanese sanctions in November of 1997. And wasn't BNP Paribas held liable for the evasion of sanctions? They were. Yes, you're- So, there was some governmental remedy against them. There was, but that fact as well gives further support of- there is not as large of a concern here for foreign policy issues when the government stepped in, held them accountable criminally, and fined them $8 billion because- And haven't the plaintiffs here also benefited from the settlement between the U.S. government and Sudan for these claims as well? Well, from a separate settlement. So, that was another public policy that addressed this underlying issue. That's correct. Yes. Unless the court has any further questions. Thank you.
judges: Rao, Sentelle, Rogers